EDGAR MUNSON AND OTHERS, RESPONDENTS, *v.* THE SYRACUSE, GENEVA AND CORNING RAILWAY COMPANY AND GEORGE J. MAGEE, APPELLANTS.

*Corporation — the president or one of its directors cannot contract with it — such a contract is void, as being against public policy.*

This action was brought to enforce an agreement between the plaintiffs and the defendant Magee, which had been subsequently assigned by Magee to the defendant The Railway Company under an agreement upon its part to carry its provisions into effect. At the time of the making of the agreement the plaintiff Munson was a director and president and the holder of a portion of the mortgage bonds of a certain railroad company (not this defendant) therein referred to. The agreement, after reciting that the company was insolvent, provided that Munson (its director, president and bondholder), should proceed at once to procure the foreclosure of the mortgage, securing the bonds issued by it, and obtain a sale of all the property, rights of way and interests of the said company; that he should purchase the property on such sale or sales and convey the same to the defendant Magee or to a railroad company which it was then proposed to organize. Magee agreed, in consideration thereof, to deliver to the plaintiffs the first mortgage bonds of the new company to an amount equal to fifty per cent of the principal and interest of the bonds held or represented by the plaintiffs in the insolvent railroad company.

*Held*, that the agreement was void, as being against public policy.

APPEAL from a judgment in favor of the plaintiffs, entered upon the report of a referee.

This action is brought upon an agreement of August 13, 1875, executed by the plaintiffs of the one part and the defendant, George

J. Magee, of the other. Magee, on the 31st of August, 1875, assigned in writing the contract to the defendant, the Syracuse, Geneva and Corning Railway Company, which instrument recited as a fact that the Syracuse, Geneva and Corning Railway Company, by resolution of its board of directors, had assumed said contract, and agreed to carry all its provisions into effect, except a portion thereof relating to freight tonnage. The Sodus Bay, Corning and New York Railroad Company (not the defendant) was organized in 1870 for the building of a railroad to extend from Corning, Steuben county, through Savona, Bradford and Penn Yan, Geneva and Lyons, to Great Sodus Bay, in Wayne county, N. Y., a distance of eighty-six miles, and in the year 1874 it became insolvent.

At the time of the agreement of August thirteenth, the plaintiff, Munson, was a director and the president and a holder of the first mortgage bonds of the old railroad. The Syracuse, Geneva and Corning Railway Company, one of the defendants, was organized August 26, 1875, for the purpose of operating a railroad from the village of Geneva, in the county of Ontario, N. Y., through the counties of Yates and Schuyler, to the village of Corning, in the county of Steuben, being about sixty miles. Munson became a director of the new railroad and was its president from its organization down to May 10, 1877.

This action is brought for the specific performance of the agreement of August 13, 1875, by which the defendant Magee agreed to deliver to the plaintiffs, for the property, rights of way, franchises and interests of the old railroad, bonds of the new railroad thereafter to be organized, amounting to fifty per cent and the unpaid interest on $241,000 of the bonds of the Sodus Bay and Corning Railroad Company (to which name the original railroad had been changed), the old bonds being either owned or controlled by the plaintiffs. The action is also brought upon the agreement of the defendant, the Railway Corporation, to carry into effect the prior contract of Magee.

*Spencer & Mills*, *Geo. T. Spencer* and *B. W. Huntington*, for the respondents.

*Hiscock*, *Gifford & Doheny* and *George F. Comstock*, for the appellants.

MACOMBER, J. :

The referee, by his report, has found very fully and accurately all of the facts appearing upon the trial of the action. There is not, as we understand it, any controversy over any of his conclusions of fact. We think that there is not any reasonable ground for a difference of opinion upon his conclusions of law as stated in his report and in his opinion, except the subject mentioned in the fifth subdivision of his opinion, relating to the question whether the contract furnishing the basis of this action was void as being against public policy.

The original agreement, after reciting the fact of the insolvency of the railroad company of which the plaintiff Munson was a director and its president, proceeded to declare that Munson should proceed at once to secure the foreclosure of the mortgage securing the bonds, and obtain a sale of all the property, rights of way and interests of the railroad company and of its successor, the Sodus Bay and Corning Railroad Company, and that he would purchase said property on such sale or sales and convey the same to the defendant Magee or to a railroad company which was then proposed to be organized. In turn, Magee agreed to deliver to the plaintiffs the first mortgage bonds of the new railroad company to an amount equaling fifty per cent of the principal and interest of the bonds held or represented by the plaintiffs. Subsequently, upon an agreement dated September 14, 1875, between the plaintiffs of the one part and the defendants of the other, the original contract was renewed and certain details added thereto. This seems to have been attached to the original agreement between the plaintiffs and Magee. In this paper the signature of the new railroad company is made by Edgar Munson, its president.

It will be seen, therefore, that one of the plaintiffs, being president of an insolvent corporation, and before any legal proceedings had been instituted to wind up its affairs and to dissolve it, entered into an agreement by which he and his associates bind themselves to procure legal proceedings to be instituted and to sell all of its property and franchises, and that a new corporation with a different name and, as the result proved, with a different line of railroad, should succeed the old company, by which arrangement the plaintiffs expected to secure themselves in part for the indebtedness to

them of the old and defunct company. There is no claim made that the other stockholders and creditors of the old road consented to the execution of this enterprise, or that their rights were to be properly protected in any way.

Munson's duty, as director and president of the old company, was to have the railroad sold, if it became necessary to sell it, by a fair and open proceeding upon which competition should not be rendered quite, if not wholly impossible, and by which the greatest amount might be realized for the liquidation of the debts of the corporation and the reimbursement of its stockholders. But as creditor of the old railroad, *and by the means in his hands as a potential director and president* of the new railroad which was to be formed upon the wreck of the other, under an agreement securing himself and his associates measurably for their apparently worthless bonds, it was his personal and private interest to purchase at the lowest possible price. We think, therefore, that the contract which forms the basis of this action was illegal, and cannot be upheld by the courts because it is clearly against public policy. It was, in point of fact, an agreement that the parties should not bid against each other at a judicial sale. (*Howell* v. *Mills*, 53 N. Y., 322; *Atcheson* v. *Mallon*, 43 id., 147; *Bliss* v. *Matteson*, 45 id., 22; *Brackett* v. *Wyman*, 48 id., 667.)

Nor are we able to see how the substituted contract of August 31, 1875, and the supplement thereto of September 14, 1875, render the plaintiffs' case any the less obnoxious to the rules of law here invoked. The same legal objections pervade all of these instruments, for they all grow out of the original agreement of August 13, 1875, which was wholly vicious. And it is hardly necessary to say that the other plaintiffs, even though they had no fiduciary relations to the old and' new companies, which would prevent them from prosecuting any legal claim at arms length, or even combining for the organization of a new railroad, cannot maintain any action upon these instruments. They were bound to know, by the terms of these several contracts and the official character which one of their associates, Munson, bore to both the old and new company, that the whole project was illegal.

In the case of the *Aberdeen Railway Company* v. *Blaikie & Brothers* (2 Eq. Rep., 1281), it appeared that the plaintiffs who

brought the suit were members of a manufacturing firm, and that one of them also was the manager of the railway corporation and chairman of its board. By resolution of the company, its engineer was authorized to contract for certain iron chairs, needed by the company; the engineer made the contract with the plaintiffs. It did not appear that the member of the firm who was also the manager of the company intermeddled with the dealing on either side, further than the assumption was made that he was present at the time of the authorization of the agent to contract. The plaintiffs brought the action to enforce specifically the performance of the contract. They succeeded in the lower courts; the defendants appealed to the House of Lords, where the ruling was unanimously reversed as being contrary to the rules of equity, because it was made between the company of which one of the plaintiffs was a manager and a private firm of which he was a member. (See, also, *Thomas* v. *B. F. K. and Pacific R. R. Co.*, 2 Fed. Rep., 877; *Hoyle* v. *P. and M. R. R. Co.*, 54 N. Y., 315; *Farley* v. *The St. Paul, etc., R. R. Co.*, 14 Fed. Rep., 114.)

The facts found in the case now to be determined render it much more favorable for the invocation of the principle there decided and here contended for by the learned counsel for the appellants, for it is quite clear that all of the contracting parties well understood that but very little work had been done upon the old railroad; that it was largely indebted outside of its mortgage obligations, and that consequently the plaintiffs' bonds were worthless. By this arrangement, if valid and enforceable, a new debtor would take the place of the old one, which would be the creature or the handiwork of the contracting parties, whose obligations by one means and another, mainly, doubtless, by inviting new subscribers to the stock and fresh buyers of the new bonds, would be sufficient to reimburse the plaintiffs for one-half of the loss which they had made in the first misadventure.

We have examined the authorities cited by the counsel for the defendants, and do not find in them anything to vary the conclusions above stated. The case more nearly resembling this than any others cited to us by them, is that of *Marie* v. *Garrison* (83 N. Y., 14). That case, however, falls short of the particular evil and vice which we think exist in this case. That was a case where a number

of stockholders entered into an arrangement for the protection of their interests, which the court held not to be prohibited by law. The fiduciary relation of the parties to the corporation, and their obligations arising out of such relations, did not enter into the case of *Marie* v. *Garrison.* Hence, we say that that case fails wholly to possess the particular feature which, in this case, makes it so obnoxious to the well established principle of equity that the courts will not enforce an agreement which, either in substance or by reason of the relations which the contracting parties bear to the subject-matter, is deemed to be against public policy.

We are constrained, therefore, to disagree with the learned referee upon this question, and consequently the judgment entered upon his report should be reversed.

Present — SMITH, P. J., HARDIN and MACOMBER, JJ.

Judgment reversed and new trial ordered before another referee, costs to abide event.